UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JERRY WAYNE MILLS                                                                              PLAINTIFF

v.                                       Civil No. 2:14-CV-02026-MEF

SHERIFF STEVEN SMITH and JAIL                                                     DEFENDANTS
ADMINISTRATOR DAVID SPICER

## MEMORANDUM OPINION

This is a civil rights action filed by Plaintiff, Jerry Wayne Mills, pursuant to the provisions of 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis* and is currently incarcerated in the Arkansas Department of Corrections ("ADC"), Varner Unit.

The parties have consented to the jurisdiction of a Magistrate Judge to conduct any and all proceedings in this case, including conducting the trial, ordering the entry of a final judgment, and conducting all post-judgment proceedings.  (Doc. 13)  Pursuant to this authority, the Court held a bench trial on April 26, 2016, and it now issues the following findings of fact and conclusions of law.

## BACKGROUND

Plaintiff filed his original Complaint on February 5, 2014.  (Doc. 1)  He alleges he was injured by a loose bunk in his jail cell on January 26, 2014 and February 11, 2014.  The events that are the subject of this lawsuit occurred while Plaintiff was incarcerated in the Logan County Detention Center ("LCDC") in Paris, Arkansas.  Plaintiff was permitted to file two Complaint Supplements on March 4, 2014.  (Docs. 19, 20)

Plaintiff seeks compensatory and punitive damages.  He also seeks to have the jail brought

1

up to code and a credible grievance system implemented. (Doc. 1, p. 7)

After summary judgment proceedings, the issues remaining for bench trial include: (1) whether overcrowding in the cell meant the loose bunk posed a substantial risk of serious harm to inmates in the cell; (2) whether the bunk fell on Plaintiff or whether he was injured trying to make it fall; and, (3) if the bunk did constitute a serious risk of harm, whether Defendants' actions constituted deliberate indifference. (Doc. 35, p. 12)

At the bench trial, the testimony of the following witnesses was heard on behalf of Plaintiff: (1) Colton Lovelace, by videoconference from the Federal Bureau of Prisons Oklahoma City Transfer Center; and, (2) Plaintiff. The testimony of the following witnesses was heard on behalf of Defendants: (1) Defendant Sheriff Steven Smith; (2) Defendant Jail Administrator David Spicer; and, (3) former LCDC Correctional Officer Dustin Stark. (Doc. 50)

## FINDINGS OF FACT

**The Inmate Riot**

At the summary judgment hearing, Plaintiff testified that on approximately January 20, 2014, there was an inmate riot in the LCDC. A bunk was ripped off the wall in cell seven and used to break down a cell door. A small fire was lit, but quickly put out with fire extinguishers. Lights and the air conditioning were broken. (Tr.[1] 22-23)

In cell six, where Plaintiff was eventually injured, a large inmate (weighing approximately 300 pounds) had jumped on the upper bunk in an attempt to rip it from the wall during the riot. (Tr. 13) The large inmate was removed from the cell, and Plaintiff was moved into it. (Tr. 17) Plaintiff testified that the bunk was sagging and tipping down at a forty-five degree angle when he

---

[1] Noncertified transcript

was put into the cell.

Defendant Spicer testified the inmates caused considerable damage to the LCDC during the riot. Over several months, there was "a lot of unruliness." Cameras were vandalized. There were some leaks in the toilets due to age, but the inmates also stuffed their uniforms down the toilets. The "beanholes"[2] constantly had problems due to having things stuffed into them to prevent them from being closed. The inmates used the beanholes to pass things to other cells and to turn the lights on and off. Defendant Spicer believed it was in cell seven that inmates ripped a bunk off the wall and used it to knock the cell door off the hinges.

Dustin Stark testified it was "rough" for about three weeks. Inmates were breaking things, flooding toilets, breaking the plastic windows in cells, throwing plates in the hallways, etc. He testified he was almost stabbed by an inmate.

Based on this testimony, I find that the LCDC had sustained considerable and ongoing facilities damage from inmates just prior to Plaintiff's two bunk-related injuries.

### Cell Dimensions

Plaintiff testified the cell is about eight feet by ten feet (8' x 10') in dimension. Colton Lovelace could not recall the dimensions of the cell. Defendant Smith testified this was intended to be a two person cell.

I find there is no dispute that cell six was intended to be a two person cell, and was approximately eight feet by ten feet (8' x 10') in size.

### Structure of the Bunks

There is also no dispute that there were two bunks in cell six. The bottom bunk is concrete

---

[2] A "beanhole" is a securable small door used to pass food trays through the cell door.

and the upper bunk is metal.  The concrete bunk is placed in the wall about two feet above the floor.  The upper metal bunk is anchored into the wall above the concrete bunk.  According to Defendant Smith, the metal bunks are attached at four points to the wall, with bolts both above and below the horizontal section of the bunk.

Plaintiff testified there was also a metal "schedule 40" support pole for the top bunk, which was loose.  Defendant Smith did not remember any posts or poles missing, and he noted all of the bunks in the LCDC had been repaired and modified in some way - some more than once.  No one other than Plaintiff testified about the existence of a support pole for the bunk, damaged or otherwise.

Based on the evidence of record, I find that the upper metal bunk in cell six was not missing a support pole, and it was normally attached to the wall by four bolts.  These bolts were attached at four points to the wall, with bolts both above and below the horizontal section of the bunk.  I further find the concrete bunk was approximately two feet above the floor, providing space for an inmate to lay on the floor beneath the concrete bunk if necessary.

**The January 26, 2014 Incident**

In his summary judgment hearing, Plaintiff testified that on January 26, 2014, he was standing on the top metal bunk to look out the window.  The bunk came loose from the wall and he fell back across the table, injuring his back and forearm.  He was taken to the Mercy Hospital Emergency Room for treatment.  He told Jailer Coop[3] Harper to tell Defendant Spicer about the bunk.  Plaintiff would not let anyone sleep in that top bunk after the January 26, 2014 incident

---

[3] According to Defendant Smith's testimony, the name of this LCDC guard is actually Cook Parker, not Coop Parker.

because his bunk was directly below it. (Tr. 19-20) Plaintiff testified standing on the bunk had been a stupid idea, but he thought the bunk would hold him because the inmate who had been in the cell before him had been a lot bigger than him. (Tr. 19) At one point in the hearing, Plaintiff testified that after the January 26, 2014 incident, the bunk was only attached to the wall by one bolt, and he "bent the bunk up" and turned a bolt so that the second bolt "kind of held it up against the wall." (Tr. 33) At other points in the hearing, Plaintiff testified the bunk was attached to the wall by two bolts at one end of the bunk. (Tr. 15, 70)

At the bench trial, Plaintiff testified he climbed up on the loose bunk to look out the window to see if his wife was coming. He testified there were only two bolts attached to the wall, so the bunk was "tippy," but he could do it. He fell and cut his wrist. He testified he did not sleep under the metal bunk until the other inmates were brought into the cell. He slept on the floor instead.

Defendant Smith did not remember Plaintiff requiring treatment at the hospital twice. He only remembered the incident on February 11, 2014, when Plaintiff received the head injury. Defendant Spicer testified that EMS is called when there is an emergency. He believed Plaintiff received medical care twice, but he would not dispute any medical records or bills which showed otherwise. His affidavit stated Plaintiff received medical care on January 26, 2014 and February 10, 2014.[4]

Medical records from Mercy indicate Plaintiff was diagnosed with a forearm laceration and back strain on January 26, 2014. (Doc. 6, p. 2) Medical records also indicate he was treated for a

---

[4] Medical records submitted from Plaintiff indicate he was treated on February 11, 2014. (Doc. 15, p. 2) Plaintiff also used both February 10, 2014, and February 11, 2014, to discuss the second incident with the bunk; however, at the summary judgment hearing he testified the second incident occurred on February 11, 2014.

scalp laceration on February 11, 2014. (Doc. 15, p. 2)

Based upon this evidence and testimony, I find Plaintiff received medical treatment for bunk-related injuries on January 26, 2014 and February 11, 2014. Plaintiff stood on the bunk on January 26, 2014, because he considered it to be capable of supporting his weight. He slept on the concrete bunk directly under the metal bunk after the January 26, 2014 incident. Plaintiff's testimony regarding the condition of the bunk after the January 26, 2014 incident is inconsistent. I find Plaintiff's testimony that he prohibited other inmates from attempting to sleep on the bunk above him to indicate that the upper bunk was sufficiently attached to the wall and in a horizontal position for another inmate to consider sleeping on it, not hanging loosely from one or two bolts.

**Discussions Regarding the Upper Bunk in Between Incidents**

Plaintiff testified in his summary judgment hearing that on a weekend shortly after the January 26, 2014 incident the jail was quite full due to weekend arrests; and, therefore, LCDC jailers wanted to house two additional inmates with Plaintiff in cell six. Coop Harper tried to bring two additional inmates into the cell and Plaintiff protested. He "squared off" with Coop Harper until Defendant Smith was called. Plaintiff made a point of "squaring off" with Defendant Smith about the upper bunk, indicating they were already short of space and bringing additional inmates into the cell would exacerbate the problem. He showed Defendant Smith that the upper bunk was about to come off the wall, and that it was not safe to sleep in the bunk or under it. According to Plaintiff, Defendant Smith promised that it would be fixed on Monday, and the additional inmates were brought in to the cell.

At the bench trial, Plaintiff testified he told Harper that if another inmate came through that door, "I'm hitting them in the mouth." Harper called Smith. When Smith came back, Plaintiff

testified he told Smith, "Do you not see this bunk?" Smith "called his bluff" and told him they were coming in, and that Plaintiff did not run his jail. Plaintiff testified he backed down after Smith "called his bluff." Plaintiff testified he did not sleep under the upper bunk until after the additional inmates were brought into the cell.

Based on this testimony, as well as the testimony discussed below, I find Plaintiff discussed the condition of the upper bunk with Defendant Smith after the January 26, 2014 incident but prior to the February 11, 2014 incident.

**February 10, 2014 Inmate Behavior Report**

Dustin Stark submitted an inmate behavior report regarding Plaintiff on February 10, 2014. This reports states:

> During the night shift before I came on some inmates messed with the electrical switches to turn on the lights. Therefore the light in the back cells have been off all day. Jerry Mills then threatened the jailers that if the lights do not get fixed then he is going to rip the bunk off of the wall and break down the door to his cell. He also said that whatever jailer is out in the hall way at the time will be jumped on and will make them bleed if that's what it takes.

Dustin Stark testified at the bench trial that Plaintiff told him directly that he would rip the bunk off the wall if the lights were not turned on.

I find Plaintiff threatened to rip the upper bunk off the wall on February 10, 2014.

**The February 11, 2014 Incident**

At his summary judgment hearing, Plaintiff testified that on February 11, 2014, he was laying on the ground drawing when the bunk came loose from the wall and hit him on the head. He was taken to Mercy Hospital ER where he was treated for a scalp laceration requiring one

7

staple. When he came back, they moved him to a different cell, and then he was taken to ADC the next day. (Tr. 16)

At the bench trial, Plaintiff testified he was laying on the bottom bunk writing to his wife. He heard a creak and looked up, and then figured it was okay. When he looked down, the bunk fell on him.

At both the summary judgment hearing and the bench trial, Plaintiff testified he did not do anything to make the bunk come down. At trial he testified he was "5'7" on a good day" and weighed about 165 pounds.

Colton Lovelace testified Plaintiff was sleeping on the bottom bunk under the upper metal bunk which fell. The other inmates were sleeping on the floor. He testified he did not know what happened. He was either laying down or talking to someone out the beanhole. He heard a noise and turned around, and Plaintiff was bleeding with the bunk on top of him. He did not see anyone doing anything wrong, and was sure he would have heard them if they did. He testified it would make a metal on concrete sound, a banging and thudding noise, because the bunk bolts were set in concrete. He believed the bunk just fell off the wall.

Dustin Stark testified the cameras were not working in the cell. According to the affidavit from Defendant Spicer, Plaintiff broke the camera in the cell. (Doc. 24-2, p. 2)

Defendant Smith testified he did talk to Plaintiff about the bunk prior to the accident. At the time, Plaintiff was the only person in the cell. Smith visually inspected the upper bunk, but he did not physically examine it. Only one corner was loose at that time, with three of the four bolts still attached. The bunk was not pulled out from the wall, and it was not dangling down. He

thought he came to the cell and talked to Plaintiff on the same day when Plaintiff was injured, but he could not swear it was the same day. It was not more than a day or two later if not the same day. Defendant Smith testified it did not make sense to him that the bunk would just fall without some cause. He further testified he told Plaintiff to leave the bunk alone, and that he would get it fixed. He would not have left him in the cell if it looked like it was about to fall. Defendant Smith testified they usually do not see what inmates do to rip the bunks down - they just see the bunk down. When the cameras were working, they have seen inmates laying on the bottom bunk and kicking up at the metal bunk.

      Dustin Stark testified the metal bunk was loose, but there was "no way" the bunk fell by itself. There was only one loose corner. If you stood or sat on the loose corner the bunk would "kind of wiggle a little." The bunk had to have been pulled down. "It was not just going to fall by itself." He was present the day of the accident, and he could hear banging in the cell; however, when he pushed the button to open the gate to get to the cell, the banging stopped. After the accident, the bunk only fell about half-way down – it was still hanging from the wall.

      Defendant Spicer was not aware of a problem with the bunk until Defendant Smith called him to tell him what happened. He did not see it himself. He did not inspect the bunk after it fell. He does remember Mills threatened to tear the bunk down.

      From the evidence presented, I find that the upper metal bunk was attached to the wall by three bolts after the January 26, 2014 incident and just prior to the February 11, 2014 incident, and that it was not hanging or dangling from the wall. The bunk was still attached to the wall by two bolts after the February 11, 2014 incident. Because the bunk was attached by three bolts to the wall prior to the February 11, 2014 incident, the bunk could not just have fallen from the wall

9

without additional stress being placed upon it by Plaintiff or another inmate in the cell. Dustin Stark heard banging coming from the cell on February 11, 2014. He was not able to use the camera to see into the cell because Plaintiff had broken the camera. By the time he entered the cell, the banging had stopped. No one, including Plaintiff's cellmate Colton Lovelace, actually saw what happened just prior to the bunk falling.

**Repair Work at LCDC**

Defendant Smith testified that repairs on the LCDC were constant and never-ending, due to damage caused by inmates. He testified there is one maintenance person who is responsible for repairs to all Logan County facilities. The jail would hire outside personnel to come in and repair things that were outside the capabilities of the in-house Logan County maintenance employee. Dustin Stark testified the inmates were "always tearing something up."

I find the LCDC was in the process of repairing the considerable and ongoing facilities damage from inmates in January and February 2014.

## CONCLUSIONS OF LAW

To prevail on his failure to protect claim, Plaintiff must satisfy a two prong test: (1) he must show he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) the prison officials were "deliberately indifferent [to his] health or safety." *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted). The first prong is an objective requirement to ensure the deprivation is a violation of a constitutional right. *Id.* The second, however, is subjective requiring Plaintiff show the official "both knew of and disregarded 'an excessive risk to inmate health or safety.'" *Id. (quoting Farmers,* 511 U.S. at 837). "An

official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007). Negligence alone is insufficient to meet the second prong; instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon County,* 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted). When evaluating whether an actor deliberately disregarded a risk, we consider his actions in light of the information he possessed at the time, the practical limitations of his position, and alternative courses of action that would have been apparent to an official in that position. We must avoid determining the question "with hindsight's perfect vision." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (internal quotations and citations omitted). At the same time, "the obvious inadequacy of a response to a risk may support an inference that the [actor] recognized the inappropriateness of his [or her] conduct." *Id.* (*citing Krout v. Groemmer*, 583, F.3d 557, 567 (8th Cir. 2009)).

There are a plethora of cases dealing with inmates falling out of bunks or slipping while trying to enter or exit them, and a few where bunks fell with inmates on them, but there appears to be only one case where a bunk actually fell on an inmate. In *Mitchell v. Sanders*, 2014 WL 4793965 (W.D. Ark. Sept. 25, 2014), the Plaintiff was assigned to a bottom bunk. The top bunk fell, striking him on the head, shoulder and arm. Because there were no allegations that Defendant Sanders was aware of the condition of the bunk, was personally involved in the inmate bunk assignments, or that he reviewed maintenance records, the claims were considered frivolous and dismissed. *Id.* at *2-*3. Defendants also cite *Funari v.Maynard,* 2010 WL 3001988 (D. Md. July 29, 2010). In *Funari*, Plaintiff's upper level bunk broke loose from the wall when he climbed on

11

to it, resulting in a head injury. Because the plaintiff there failed to proffer evidence which would show defendants were aware of any issue with that bunk before he fell, or that there were issues with other bunks in the jail which could put them on notice generally, plaintiff's claim regarding the bunk failed. *Id.* at *2.

The Eighth Circuit has addressed the failure to repair dangerous conditions several times in the context of inmate work assignments. "It is well established that when prison officials intentionally place prisoners in dangerous surroundings . . . they violate the Eighth Amendment." *Fruit v. Norris*, 905 F.2d 1147, 1150 (8th Cir. 1990). In *Fruit*, allegations that inmates were forced to clean out a raw sewage wet-well for the prison sewage system in temperatures reaching 125 degrees Fahrenheit, and without required protective gear, was sufficient to survive a Rule 41(b) motion for dismissal. *Id.* at 1151.

In contrast, failing to repair or maintain work equipment has been held to be mere negligence. *See e.g*. *Warren v. State of Mo.*, 995 F. 2d 130 (8th Cir. 1993) (failure to add safety equipment to table saws was mere negligence, even assuming Plaintiffs' allegations of prior accidents were true, because prison officials investigated each accident and ensured equipment was working properly); and, *Bibbs v. Armontrout*, 943 F. 2d 26 (8th Cir. 1991) (failure to replace a missing safety guard on license plate "inker," which resulted in partial loss of two fingers, was mere negligence because there was no evidence showing that the prison officials knew that guards were not covering the gears of the inker or that they willfully overlooked the condition of the equipment).

In a more general facilities maintenance context, an inmate claim that prison guards had

12

intentionally removed the safety shield from the tuberculosis lights in his cell, thus exposing him to ultraviolet radiation for fourteen hours, was sufficient to survive summary judgment; however, the prison maintenance supervisor's failure to replace the shield promptly after he was notified it was missing was mere negligence. *Williams v. Jackson*, 600 F.3d 1007, 1014 (8th Cir. 2010).

The evidence presented at the bench trial, combined with the ability to apply credibility analysis, makes it clear Plaintiff has failed to meet either prong of the test to prevail on his failure to protect claim. Instead, Plaintiff's own actions, not those of any state actor, were the proximate cause of Plaintiff's injuries on both January 26, 2014 and February 11, 2014. *See Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) (noting there would be no proximate causation, and therefore no § 1983 liability, if Plaintiff had the opportunity to stop voluntarily at the roadblock but had "negligently or intentionally driven into it" instead); and, *Horn by Parks v. Madison County Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994) ("proximate causation is an essential element of a § 1983 claim for damages").

The loose bunk did not pose a substantial risk of harm to Plaintiff, even with the additional inmates in the cell. There is no dispute that the upper metal bunk in cell six was already damaged when Plaintiff was placed in the cell after the inmate riot. Plaintiff's allegation, however, that it simply fell off the wall on February 11, 2014, with no more warning than a slight creaking noise, is simply not credible. The bunk was normally attached to the wall with four bolts embedded in concrete. After the damage sustained in the inmate riot, only one of the four bolts was loose. Even after Plaintiff stood on it to look out of the window on January 26, 2014, the bunk was still attached to the wall by three bolts, was not dangling, and was in no danger of falling without further assistance from an inmate. Plaintiff himself considered the bunk capable of supporting his weight

to stand on it in January, 2014. He also continued to sleep under the bunk and found it necessary to prohibit other inmates from attempting to sleep on the top bunk. The fact that Plaintiff found it necessary to prohibit other inmates from using the top bunk indicates that the bunk was apparently in a condition which could have conceivably supported an inmate. This is not indicative of a bunk dangling from the wall and poised to fall at any moment without warning. Even after the February 11, 2014 incident, the bunk was still attached to the wall by two bolts. Finally, Plaintiff also had the option of sleeping under the lower concrete bunk, which by his testimony was raised two feet off the floor, if he was concerned about the top bunk and if space elsewhere in the cell was limited by overcrowding.

  The timing of the February 10, 2014 inmate behavior report, in relation to the February 11, 2014 incident, indicates Plaintiff was responsible for the second bolt coming loose from the wall on February 11, 2014. On February 10, 2014, Plaintiff threatened to rip the bunk from the wall and use it to break down the cell door because he was angry about the state of the lights. On February 11, 2014, Dustin Stark heard a banging noise coming from cell six, which stopped when he approached the cell. Shortly afterward, Plaintiff was injured when the second of four bolts came loose. By his own testimony Plaintiff was laying on the concrete bunk below the upper metal bunk. Defendant Smith noted that a common way for inmates to break a bunk is to lay underneath it and kick up at it. Therefore, the credible testimony in this case indicates Plaintiff was injured while trying to remove the bunk from the wall as he had threatened to do the previous day.

  Plaintiff was also responsible for the damage to the bunk and his injuries for the January 26, 2014 incident. Plaintiff admitted that climbing up and standing on a bunk which he characterized as "tippy" was "stupid." Further, Plaintiff's testimony that the bunk fell from the

14

wall and caused him to fall off is not credible. Both Defendant Smith and Dustin Stark saw the bunk after the January 26, 2014 incident and noted it was still attached to the wall by three bolts and was not hanging or dangling. The upper metal bunk was still not completely detached from the wall even after the February 11, 2014 incident. Plaintiff continued to sleep under the bunk after the January 26, 2014 incident, and he felt it necessary to prohibit other inmates from sleeping on the top bunk, ostensibly because it still looked like someone could use it to sleep.

Finally, even if the damaged bunk had met the first prong of the test, neither Defendant was deliberately indifferent to Plaintiff's health or safety regarding the bunk. Defendant Spicer was not informed of any issues with the bunk until Defendant Smith called him after the February 11, 2014 incident. Defendant Smith knew about the loose bolt on the bunk, but he felt that it was not in danger of falling because the bunk was still attached to the wall by the three remaining bolts. He testified he would have moved Plaintiff to another cell if it appeared the bunk was in danger of falling off the wall; however, in his opinion it was not going to fall if it was left alone. Thus, neither Defendant knew of a substantial risk of harm and recklessly disregarded that risk.

The practical limitations of the situation also indicate there was no deliberate indifference on the part of Defendants. From the testimony at both the summary judgment hearing and at the bench trial, it is clear the LCDC sustained considerable damage to the facilities caused by the inmates. With only one maintenance and repair person responsible for all Logan County facilities, there is no question that repairs would have to be prioritized. The Court can see no deliberate indifference apparent in designating a damaged bunk, in no apparent danger of falling, to be of a lesser priority than lighting or other more pressing facilities repairs.

## CONCLUSION

For the reasons stated above, Plaintiff's Complaint (Doc. 1), as supplemented (Docs. 19, 20), is **DISMISSED WITH PREJUDICE**. A separate judgment in accordance with this opinion will be entered.

Dated this 3rd day of March, 2017.

/s/ *Mark E. Ford*

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE